## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| TERESA EDGINGTON, | ) | CASE NO. 1:18CV1736 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Teresa Edgington, ("Plaintiff" or "Edgington"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her application for Period of Disability ("POD") and Disability Insurance Benefits

("DIB"), under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation.  For the reasons set forth below, the Magistrate Judge

recommends that the Commissioner's final decision be AFFIRMED.

### I.   PROCEDURAL HISTORY

In September 2015, Edgington filed an application for POD and DIB, alleging a disability

onset date of January 1, 2011 and claiming she was disabled due to panic disorder with

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security.

agoraphobia, post-traumatic stress disorder, major depressive disorder, fibromyalgia, cervical

spine disease with radiculopathy, cervical spondylosis, cervical myositis and foraminal stenosis,

lumbar spondylosis with myelopathy, lumbar radiculopathy, and degeneration of intervertebral

discs.  (Transcript ("Tr.") 15, 146, 164.)  The applications were denied initially and upon

reconsideration, and Edgington requested a hearing before an administrative law judge ("ALJ").

(Tr. 15, 98-101, 103-105, 110.)

On August 4, 2017, an ALJ held a hearing, during which Edgington, represented by

counsel, and an impartial vocational expert ("VE") testified.  (Tr 33-67.)  On December 28, 2017,

the ALJ issued a written decision finding Edgington was not disabled.  (Tr. 15-28.)  The ALJ's

decision became final on May 21, 2018, when the Appeals Council declined further review.  (Tr.

1-6.)

On July 26, 2018, Edgington filed her Complaint to challenge the Commissioner's final

decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 12, 14, 16.)

Edgington asserts the following assignments of error:

(1)    The ALJ committed an error of law and the decision is not supported by
       substantial evidence as the ALJ improperly concluded that Teresa does not
       satisfy Listings 12.04, 12.06, and 12.15 for failure to satisfy the
       "Paragraph B" criteria.

(2)    The ALJ erred by not following the requirements of SSR 96-8p when
       making the RFC finding, and the RFC finding is not supported by
       substantial evidence.

(Doc. No. 12 at 2.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Edgington was born in January 1969 and was forty-eight (48) years-old at the time of her

2

administrative hearing, making her a "younger" person under social security regulations.  (Tr. 27.)  *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c).  She has at least a high school education and is able to communicate in English.  (*Id.*)  She has past relevant work as a bookkeeper.  (*Id.*)

**B.      Relevant Medical Evidence[2]**

      **1.        Mental Impairments**

In February 2010, Edgington presented to Jamie Page, a "Readjustment Counselor" at the Veteran's Administration[3] ("VA") to establish treatment for increasing depression, anxiety, insomnia, and intrusive thoughts.  (Tr. 275-276.)  On mental status examination the following month, Ms. Page noted a friendly and cooperative manner with neat appearance, appropriate speech and affect, normal memory function, "relaxed, at ease" motor activity, and good judgment.  (Tr. 239-240.)

In January 2011, however, Edgington called the VA suicide prevention hotline to report increased anxiety, lack of motivation, and depressive symptoms.  (Tr. 834.)  Edgington stated she "has not answered her phone in approximately one month, has not attended regularly scheduled counseling sessions since the Thanksgiving Holiday, and had not arrived to work since New Years Eve."  (Tr. 835.)  She also stated she had been "going down hill" since March 2010, explaining "I'm starting to scare myself."  (Tr. 834-835.)

The record reflects Edgington met with Ms. Page on at least nineteen (19) occasions in

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

[3] The record reflects Edgington was active duty for three years with the Army.  (Tr. 421.) She denied any combat experience or deployments, but indicated she suffered from military sexual trauma due to rape and assault.  (*Id.*)

2011.  (Tr. 260-273.)  At the majority of these visits, Edgington presented with a depressed mood and affect.  (*Id*.)  In January, she reported isolating and intrusive thoughts, insomnia, depression, suicidal thoughts, panic attacks, and nightmares.  (Tr. 273-274.)  She stated she "lost all of her jobs . . . has not been leaving her house, and she has pulled away from everyone."  (*Id*.)  In February, Edgington was "overwhelmed" and making "limited progress" towards her treatment goals.  (Tr. 272.)  In March, she indicated she had not left her house for several weeks "due to fear and shame."  (Tr. 271.)  The following month, Edgington stated she had put black bags over her windows "fearing someone is looking in at her."  (Tr. 270.)  In April, Edgington stated she "has not left the house and laid in bed for three days."  (Tr. 269.)  Several weeks later, however, she had a euthymic mood and affect.  (*Id*.)  In June, Edgington reported continued depression over the recent death of her mother, but stated she was "getting out more and feeling less anxiety."  (Tr. 267.)

In August 2011, Edgington reported feeling overwhelmed by foreclosure proceedings and "pending homelessness."  (Tr. 266.)  In September, Ms. Page noted as follows:

> Veteran presented over the last year with anxiety and depression.  Veteran currently reports depression 7/7 days at 9-10/10, avoidance and anxiety at 9/10 on most days. Over the last year, veteran has had increased physical health problems, was contacted by a physically abusive ex-husband . . ., lost her job due to increased PTSD/depression, has been dealing with foreclosure, the death of her mother, the sole provider/caregiver for autistic son, and now managing the care of her father since her mother's death.  Veteran's primary coping over the last year has been avoidance.  She has gone up to a week without getting out of bed, missing appointments, calling crisis hotline for support, not taking medications, not answer[ing] phone calls and not paying bills.  She has continued to keep socially isolated. . .

(Tr. 265.)  Edgington reported depression, anxiety, panic attacks, and "some suicidal thoughts."

(Tr. 264.)  In November 2011, she continued to report feelings of depression, lack of motivation,

and "feeling like a failure," stating she "continued to have days [where] she spends all day in bed."  (Tr. 260, 262.)  In December, Edgington had a euthymic mood and affect, but rated her depression and anxiety a 7 on a scale of 10.  (Tr. 260.)

During 2011, Edgington also presented regularly to psychiatrist Amal Rubai, M.D.  In March 2011, she reported poor energy/motivation, paranoia, panic attacks, nightmares, flashbacks, and severe anxiety.  (Tr. 831.)  On examination, she was alert and oriented with fair hygiene, cooperative behavior, good eye contact, normal speech and psychomotor activity, reactive affect, organized thought process, fair insight, and "mediocre" judgment.  (Tr. 832.)  Dr. Rubai noted Edgington "managed to smile" but was tearful at times.  (*Id.*)  She diagnosed PTSD, rule out major depressive disorder, and rule out panic disorder with agoraphobia; and assessed a Global Assessment of Functioning[4] ("GAF") of 50, indicating serious symptoms.  (*Id.*)  Dr. Rubai increased Edgington's Paxil dosage, and advised her to restart Ambien and "Ohzine."  (*Id.*)

In August 2011, Edgington reported an increase in suicidal thoughts and indicated her medication "wasn't working."  (Tr. 828.)  In a visit with Dr. Rubai the following month, she admitted to non-compliance with her medications due to lack of motivation.  (Tr. 823.)  On

---

[4] The GAF scale reports a clinician's assessment of an individual's overall level of functioning.  An individual's GAF is rated between 0-100, with lower numbers indicating more severe mental impairments.  A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.  A score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  A recent update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."  *See Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

examination, she was alert and oriented with fair hygiene and grooming, cooperative behavior, good eye contact, normal speech and psychomotor activity, depressed mood, reactive affect, organized thought process, fair insight, and "mediocre-limited" judgment.  (Tr. 823-824.)  Dr. Rubai diagnosed PTSD, major depressive disorder, and rule out panic disorder with agoraphobia; and assessed a GAF of 45, indicating serious symptoms.  (Tr. 824.)

In November 2011, Edgington reported feeling better over the last several weeks.  (Tr. 806.)  She described her mood as "better," "above content," with "no desire to crawl in bed like I used to."  (*Id*.)  Edgington indicated her sleep was erratic, however, resulting in poor concentration.  (*Id*.)  She also continued to report panic attacks and nightmares.  (*Id*.)  On examination, Edgington was alert and oriented with good hygiene, calm and cooperative behavior, good eye contact, a smiling mood, "brighter, more reactive" affect, normal speech and psychomotor activity, organized thought process, fair insight, and mediocre judgment.  (*Id*.)  Dr. Rubai assessed a GAF of 55 (indicating moderate symptoms), and continued Edgington on her medications.  (Tr. 808.)

In December 2011, Edgington again reported feeling more productive, but continued to complain of panic attacks, erratic sleep, and flashbacks.  (Tr. 800.)  Examination findings were the same as the previous visit.  (*Id*.)  Dr. Rubai assessed a GAF of 55, and increased Edgington's Paxil and Gabapentin dosages.  (Tr. 801.)

Edgington presented to Ms. Page sporadically in 2012, seeing her on five occasions.  (Tr. 253-259.)  She reported increased depression in January of that year.  (Tr. 259.)  In March, Edgington stated she experienced depression "50% of the days, several of those days struggling to get out of bed."  (Tr. 257.)  Ms. Page described her progress as "stagnant."  (*Id*.)  Later that

6

month, Edgington presented with euthymic mood and affect, but continued to report depression, insomnia, and anxiety.  (Tr. 256.)  In April, she complained of nightmares/terrors 4 to 5 times per week for the past several weeks.  (Tr. 255.)  In May, Edgington indicated she had not been out of bed or showered for the previous two weeks.  (Tr. 254.)

Edgington presented to Dr. Rubai in February, April, and May 2012.  (Tr. 789-791, 773-775, 752-755.)  In February, she complained of increased depression, poor energy and concentration, and panic attacks several times per week.  (Tr. 789.)  Examination findings were largely normal, aside from restricted affect, fair insight, and mediocre judgment.  (Tr. 790.)  Dr. Rubai assessed a GAF of 55; continued her on Paxil, Gabapentin, and Ambien; and prescribed Wellbutrin.  (Tr. 791.)

In April 2012, Edgington reported some improvement with Wellbutrin, stating her mood was "pretty good today" and that she had "less [of a] need to lay in bed all day."  (Tr. 773.)  She continued, however, to complain of poor sleep, low energy, poor concentration, panic attacks, and nightmares.  (*Id*.)  Examination findings were largely normal.  (*Id*.)  Dr. Rubai noted Edgington's "mood is again improving," but found she still suffered from ongoing moderate PTSD symptoms.  (Tr. 774.)  She assessed a GAF of 55, and continued Edgington on her medications.  (Tr. 775.)

In May 2012, Edgington stated the previous month had been a "bad month" during which she "stayed in bed most of the time."  (Tr. 752.)  She reported her sleep was erratic, but indicated her concentration was improved with no recent panic attacks.  (*Id*.)  Examination findings were normal.  (*Id*.)  Dr. Rubai noted that Edgington's mood symptoms "vary each visit."  (Tr. 754.)  She again assessed a GAF of 55, and continued Edgington on her medications.  (*Id*.)

7

In 2013, Edgington only presented to Ms. Page on two occasions.  (Tr. 250-252.)  In February, she presented with a depressed mood and affect, and indicated she had "been isolating and depressed for the last 6 months or so."  (Tr. 252.)  Edgington also reported she had started drinking "a couple times a week to sleep."  (*Id.*)  In October, Edgington again reported feeling depressed and isolated.  (Tr. 250.)

On May 20, 2013, Edgington presented to primary care physician Megan McNamara, M.D.  (Tr. 634-638.)  She stated she had been "very depressed and [was] only now starting to come out of her depression."  (Tr. 636.)  Edgington reported she had recently confided in a friend that she was sexually assaulted while in the military, which "precipitously worsened her mood" and caused her to experienced passive suicidal ideation.  (*Id.*)  She had run out of her psychiatric medications.  (*Id.*)  Dr. McNamara described Edgington's depression as "moderate-severe" and advised her to re-establish care with psychiatry.  (Tr. 637-638.)

Edgington returned to Dr. Rubai in June 2013, after a year long gap in treatment.  (Tr. 628-632.)  She indicated she had stopped taking her medications for over six months and admitted to heavy alcohol use, including binge drinking.  (Tr. 628.)  Edgington reported increased depression and stated she kept her curtains down and avoided leaving the house.  (*Id.*)  She complained of poor sleep, daily panic attacks, and "vague auditory hallucinations."  (*Id.*)  Examination findings were normal aside from a depressed mood and hallucinations.  (Tr. 629.)  Dr. Rubai diagnosed chronic PTSD, recurrent major depressive disorder, and panic disorder with agoraphobia; and assessed a GAF of 51.  (Tr. 631-632.)  She prescribed Ativan, and advised Edgington to continue with Paxil and Wellbutrin. (Tr. 632.)

In July 2013, Edgington reported she was avoiding counseling sessions with Ms. Page,

8

and indicated her depression level was "going up." (Tr. 622.) She indicated she was staying in bed "a lot" and continued to experience panic attacks, but denied auditory hallucinations. (*Id.*) Examination findings were normal. (Tr. 623.) In October 2013, Edgington described her mood as "pretty bad" and "depressed," and complained of poor sleep and concentration. (Tr. 615.) She also reported panic attacks four times per week, recent "anger outbursts," and nightmares. (*Id.*) Aside from a "bad" mood and reactive affect, examination findings were normal. (Tr. 616.) During both of these visits, Dr. Rubai assessed a GAF of 51, and adjusted Edgington's medications. (Tr. 624, 618.)

In November 2013, Edgington reported some improvement with medication, including better sleep and decreased suicidal ideation. (Tr. 588-590.) She continued to complain, however, of angry mood, avoidant behavior, poor energy, fair concentration, occasional paranoia, daily panic attacks, and nightmares. (Tr. 588.) Examination findings were largely normal, and Dr. Rubai continued Edgington on her medications. (Tr. 590.)

Edgington did not return to Dr. Rubai until nearly a year later, on October 9, 2014. (Tr. 497-501.) She reported she had stopped taking her medications in February of that year, but restarted in September. (Tr. 497.) Edgington complained of poor sleep, low energy, poor concentration, occasional paranoia, and PTSD symptoms. (Tr. 498.) Dr. Rubai discussed "her pattern of behavior and non-compliance and emphasized importance of ongoing counseling." (*Id.*) On examination, Dr. Rubai noted depressed mood, reactive affect, good hygiene and grooming, cooperative behavior, good eye contact, normal psychomotor activity and speech, organized thought process, fair insight, and mediocre-limited judgment. (*Id.*) She diagnosed chronic PTSD, recurrent major depressive disorder, and panic disorder with agoraphobia;

9

assessed a GAF of 40; and continued Edgington on Paxil, Wellbutrin, and Lunesta.  (Tr. 500.)

On December 3, 2014, Edgington established treatment with social worker Audrey Pace. (Tr. 416-422.)  Examination findings were normal, including friendly and cooperative demeanor, normal speech and psychomotor activity, calm mood, full affect, and "no sign of hopelessness, helplessness, and worthlessness."  (Tr. 416.)  Edgington admitted to a history of suicidal thoughts that "continues in waves," and noted she had been raped and sexually assaulted in the 1980's while serving in the military.  (Tr. 417.)  She returned to Ms. Pace on December 9, 2014, at which time Ms. Pace concluded Edgington was at a "moderate to high chronic risk of [self] harm."  (Tr. 407.)  Mental status examination findings were normal, aside from "some hopelessness, helplessness, or worthlessness."  (*Id*.)

Edgington returned to Dr. Rubai on December 11, 2014.  (Tr. 401-406.)  She reported some benefits from medication, stating "I feel hopeful, not as depressed."  (Tr. 401.)  Edgington, however, continued to report poor concentration, occasional paranoia, panic attacks when she has to leave the house, nightmares, and flashbacks.  (*Id*.)  Examination findings were largely normal. (Tr. 402.)  Dr. Rubai assessed a GAF of 55, and found Edgington's "chronic intermittent suicidal ideation place[s] her at chronic moderate risk."  (Tr. 405.)  Shortly thereafter, Edgington presented to clinical psychologist Jennifer Knetig, Psy.D.  (Tr. 395.)  Dr. Knetig noted Edgington's "affect was initially rather bright, becoming tearful at times over the course of the session, and appeared congruent with a labile mood."  (*Id*.)

On January 21, 2015, Edgington called the VA suicide hotline.  (Tr. 384-385.)  She reported she had not left her house in a month, had been canceling appointments with her therapist, and was struggling with depression.  (*Id.*)

10

The following month, Edgington returned to Ms. Pace.  (Tr. 368-370.)  On examination, Edgington had fair grooming and hygiene, appropriate eye contact, friendly and cooperative demeanor, and normal speech and psychomotor activity.  (Tr. 368.)  Ms. Pace also noted depressed and cautious affect, an overwhelmed mood, and "some hopelessness, helplessness, or worthlessness."  (*Id*.)  At this visit, Edgington shared the details of her sexual assault while in the military and discussed how that experience continued to cause PTSD symptoms.  (Tr. 368-369.)  Ms. Pace found Edgington continued to be at a "moderate to high chronic risk of [self] harm."  (*Id*.)

The record reflects Edgington reestablished treatment with social worker Ms. Page in 2015, seeing her on 15 occasions between June and December of that year.  (Tr. 243-249, 1064-1065.)  In June and July, Edgington presented with a depressed mood and affect.  (Tr. 249.)  In August, she reported "daily feelings of 'feeling out of control,' shame, intrusive thoughts daily, insomnia, depression, and anxiety."  (Tr. 247-248.)  In September, Edgington stated she stayed in bed for three days and "did not shower, get dressed, or do anything."  (Tr. 246.)  She reported continued depression anxiety and depression throughout September and October.  (Tr. 244-245.)  By the end of October, Edgington had a euthymic mood and reported she "has been depressed most days but has forced herself to get up and get at least one thing accomplished."  (Tr. 243.)

Meanwhile,  Edgington returned to Dr. Rubai on August 12, 2015 with continued complaints of poor energy, terrible concentration, and hypervigilance.  (Tr. 329.)  She indicated her medication was helping with her mood, stating she was "not as weepy."  (*Id*.)  Examination findings were largely normal.  (Tr. 330.)  Dr. Rubai assessed a GAF of 60 (indicating moderate symptoms) and continued Edgington on her medications.  (Tr. 333.)

11

The following week, Edgington presented to pain management physician Elias Veizi, M.D.  (Tr. 320-326.)  On examination, Dr. Veizi noted Edgington was alert and oriented, and found her "recent/remote memory as evidenced through face-to-face interaction and discussion appear grossly intact."  (Tr. 321.)  Due to her "diagnosis of fibromyalgia [and] comorbidities of depression and anxiety," he recommended Edgington consider an intensive outpatient rehabilitation program ("IOP").  (Tr. 323.)

Edgington returned to Dr. Rubai in September, October, November, and December 2015. (Tr. 316-318, 301-304, 1159-1162, 1118-1122.)  In September, Edgington described her mood as "okay" but continued to complain of poor sleep, low energy, poor concentration, daily panic attacks, and hypervigilance.  (Tr. 316.)  Examination findings were largely normal.  (Tr. 317.) Dr. Rubai assessed a GAF of 60 and adjusted Edgington's medications, prescribing Cymbalta. (Tr. 318.)  In October, Edgington reported increased nightmares and daily panic attacks.  (Tr. 301.)  On examination, Dr. Rubai noted an anxious tone, "okay" mood, and reactive affect.  (Tr. 302.)  She adjusted Edgington's medications.  (Tr. 303.)  In November, Edgington indicated that Cymbalta was helping with her anxiety, but reported that a recent health scare had heightened her symptoms.  (Tr. 1159.)  Examination revealed an anxious tone and affect, and "horrible" mood. (Tr. 1160.)  Finally, in December, Edgington again reported experiencing some relief with Cymbalta.  (Tr. 1118.)  However, she also admitted to "fleeting" suicidal ideation, daily panic attacks lasting up to an hour, nightmares, flashbacks, and anxiety.  (*Id*.)  Dr. Rubai assessed a GAF of 60, and adjusted Edgington's medications.  (Tr. 1121.)

Edgington also presented to psychologist Cynthia Vankeuren, Psy.D., in December 2015. (Tr. 1099-1100.)  She was "very happy" with Cymbalta, stating it helped with both her physical

12

pain and anxiety/depression and was "life changing." (Tr. 1099.)  Examination findings were

normal. (*Id.*)  Dr. Vankeuren noted Edgington had "considerable anxiety that has been

debilitating to her." (Tr. 1100.)  She explained that Edgington was considering participating in

an intensive outpatient program, but was "anxious about being out of the house for an entire

program day." (*Id.*)

> On December 7, 2015, Ms. Page wrote a letter on Edgington's behalf, as follows:
>
> Ms. Edgington is a disabled 100% service connected veteran diagnosed with Post
> Traumatic Stress Disorder (PTSD).  Ms. Edgington has been in treatment at the
> Department of Veterans Affairs for PTSD with this writer since April of 2003.
>
> Ms: Edgington suffers from chronic PTSD and the frequency and intensity of her
> symptoms continue to interfere with the quality of her life occupationally, socially,
> and emotionally.  The most profound symptoms include daily panic attacks,
> depression, anxiety, insomnia, flashbacks, nightmares of actual events, difficulties
> concentrating, memory issues, hyper-startle, and hyper-vigilance.
>
> The area Ms. Edgington has the most difficulties is in interacting/being around
> people.  She has panic attacks most days leaving her home.  Her daughter and
> friend take care of the majority of tasks outside the home including grocery
> shopping and one of them often accompanies her to appointments.  They also
> remind her to take care of ADL's, remind her about taking medications, and assist
> her in taking care of the upkeep of her home.
>
> Despite Ms. Edgington's efforts in treatment, her PTSD symptoms continue to
> interfere with the quality of her life.  She is currently involved in weekly individual
> therapy and will start a women's PTSD treatment group January of 2016.

(Tr. 1058.)  Later that month, Ms. Page noted Edgington was depressed, anxious, and agitated;

and had only been leaving the house for doctor appointments.  (Tr. 1064.)

Edgington returned to Dr. Rubai on two occasions in 2016.  On January 7, 2016, she

reported that Cymbalta helped with her mood and pain, but continued to complain of poor energy

and concentration, daily panic attacks, "worrying about everything," and intrusive thoughts.  (Tr.

1086.)  Examination findings were normal aside from a "down" mood and reactive affect.  (Tr.

13

1087.)  The following month, Dr. Rubai noted a depressed mood, anxious affect, and anxious

tone.  (Tr. 1333.)  She assessed a GAF of 55, and referred Edgington for a consult for possible

treatment at the VA's "Day Hospital."  (Tr. 1336.)  On February 11, 2016, psychologist

Josephine Ridley, Psy.D., found that Edgington met the criteria for participation in the Day

Hospital with treatment focusing on "improving overall coping skills and reducing depressive

symptoms."  (Tr. 1421.)

   The record also reflects Edgington presented regularly to Ms. Page during 2016.  In

January, she was disheveled and presented with a depressed mood and affect.  (Tr. 1063.)

Edgington reported she was "sleeping a lot, not getting out of bed, not eating."  (*Id*.)  In

February, she continued to report increased depressive symptoms, including missing

appointments, not taking her medications, not returning phone calls, and staying in the house.

(Tr. 1062, 1520-1521.)  In April, Edgington indicated she had been "very depressed" due to

physical health problems and foreclosure proceedings.  (Tr. 1518-1519.)  In May, she felt

depressed and worthless.  (Tr. 1518.)  In June, Edgington was anxious, depressed, overwhelmed,

and not sleeping.  (Tr. 1516.)  In July, August and September, she reported fear and anxiety over

upcoming back surgery.  (Tr. 1512-1514.)  Following her surgery, Edgington continued to

present with a depressed mood and affect.  (Tr. 1511.)  She reported suicidal thoughts in

November 2016, and was flagged as a high suicide risk.  (Tr. 1510, 1565-1566.)  In December,

Edgington stated she was "struggling to get out of the house."  (Tr. 1509.)

   On April 25, 2017, Edgington returned to Dr. Rubai.  (Tr. 1561-1566.)  She admitted she

had taken herself off all her psych medications for about two weeks in March because she "didn't

care."  (Tr. 1562.)  Her daughter realized Edgington was not taking her medications, and

convinced her to resume taking them.  (*Id.*)  Edgington remarked " there was [a] noticeable difference in my attitude on every level when I went back on meds."  (*Id.*)  Specifically, she stated Buspar made her feel "calmer" and Cymbalta helped with both her depression and anxiety. (*Id.*)  However, Edgington continued to report erratic sleep, panic attacks, excessive worrying, flashbacks, and intrusive memories.  (*Id.*)  On examination, Dr. Rubai noted good hygiene, fair grooming, cooperative behavior, good eye contact, normal speech and psychomotor activity, improved mood, mild reactive affect, organized thought process, and fair insight and judgment. (Tr. 1563.)

Dr. Rubai noted a "pattern of noncompliance with meds and follow up."  (Tr. 1565.)  She assessed moderate depression/anxiety with avoidance behavior, and noted Edgington's mental health symptoms were more manageable with medication.  (*Id.*)  Dr. Rubai noted Edgington had declined participating in the VA's Psychosocial Residential Rehabilitation Treatment Program ("PRRTP").  (Tr. 1566.)  She found a GAF of 59 (indicating moderate symptoms) and adjusted Edgington's medications.  (Tr. 1565.)

On May 24, 2017, social worker James Holbrook, LISW-S, recommended removing Edgington's high risk for suicide flag.  (Tr. 1548-1549.)  He noted she had attended most of her mental health appointments, and had reported "a sustained stabilization of her mood symptoms over the past two months."  (*Id.*)  Mr. Holbrook also concluded Edgington reported "use of sufficient coping skills to remain safe and engage in symptom management."[5]  (*Id.*)

---

[5] The record also reflects that, during 2017, Edgington presented for individual therapy with Ms. Page, as well several group therapy sessions.  (Tr. 1501-1507.)

15

2.       **Physical Impairments**

On October 7, 2011, Edgington presented to primary care physician Megan McNamara,

M.D., for evaluation of lower back pain.  (Tr. 817-822.)  She complained of "very severe,"

aching, constant back pain, as well as numbness radiating to her toes.  (Tr. 819.)  On

examination, Dr. McNamara noted 5/5 muscle strength in Edgington's lower extremities with the

exception of her hip flexors which were 4/5 in strength.  (*Id*.)  Dr. McNamara could not elicit

reflexes in Edgington's right ankle, and straight leg testing was positive on the left.  (*Id*.)  She

also noted tenderness to palpation in Edgington's bilateral lower spine.  (*Id*.)  Dr. McNamara

prescribed Naproxen, and ordered X-rays.  (*Id*.)

Edgington underwent lumbar x-rays on October 17, 2011, which were normal.  (Tr.

1053.)  Dr. McNamara then ordered an MRI of her lumbar spine, which Edgington underwent on

December 3, 2011.  (Tr. 821, 1049.)  The MRI showed the following: (1) a focal annular tear

with diffuse disc bulge and small central disc herniation causing mild central canal compromise

at L5-S1; (2) mild bilateral neural foramen compromise from disc osteophytes; and (3) bulging

disc causing mild bilateral neural foramen compromise at L4-L5 level.  (Tr. 1050-1051.)

In December 2011, Edgington reported she was "feeling much better" and using a

supportive pillow which provided "significant relief."  (Tr. 821.)  At that time, she was taking

Naproxen and Flexeril with "some improvement in symptoms."  (*Id.*)

On January 5, 2012, Edgington presented to pain management physician Alfred Beshai,

M.D., with complaints of low back pain, bilateral lower extremity pain, and tingling and

numbness greater on the left than the right.  (Tr. 794-796.)  She rated her pain a 7 on a scale of

10, and described it as continuous, sharp, stabbing, and aching.  (Tr. 794.)  On examination, Dr.

Beshai noted limited lumbar spinal range of motion, abnormal reflexes, tenderness in Edgington's lumbar spine, positive straight leg testing bilaterally, and positive Patrick/FABER testing on the left.  (Tr. 795-796.)  He also found normal gait, normal lumbar lordotic curve, no swelling, 5/5 strength in all muscle groups, and intact sensation.  (*Id*.)  Dr. Beshai concluded Edgington was "most likely experiencing neuropathic pain" and recommended injections and physical therapy.  (Tr. 796.)  He also prescribed Topamax, and recommended she exercise and lose weight.  (*Id*.)

On May 21, 2012, Edgington presented to pain management specialist Dina Hanna, M.D., for a second opinion.  (Tr. 756-757.)  On examination, Dr. Hanna noted a slow but non-antalgic gait, normal sensation, 5/5 muscle strength, negative facet loading testing, and positive straight leg testing bilaterally.  (*Id*.)  Dr. Hanna also found painful and decreased range of motion in Edgington's lower spine, but noted she was able to do toe and heel walking.  (*Id*.)  She diagnosed bilateral lumbar radiculitis at L4-L5, recommended injections, and prescribed Neurontin.  (*Id*.)

Edgington returned to Dr. McNamara on July 16, 2012.  (Tr. 735-740.)  She complained of left knee pain and swelling, and right hand numbness and tingling.  (Tr. 738.)  On examination of Edgington's left knee, Dr. McNamara noted mild swelling, full range of motion, no tenderness to palpation, negative Lachman's and McMurray's, and no instability.  (Tr. 739.)  She also found 5/5 muscle strength in her biceps, triceps, and wrists; normal grip strength, and decreased sensation over the 3rd, 4th, and 5th fingers of Edgington's right hand.  (*Id*.)  Dr. McNamara diagnosed patellar tendonitis and ulnar neuropathy.  (*Id*.)  She recommended knee injections, prescribed an elbow pillow, and referred Edgington to rheumatology.  (*Id*.)

On August 7, 2012, Edgington presented to rheumatologist Anthony Betbadal, M.D., with

complaints of pain in her left knee, bilateral wrists, right elbow, and left hip.  (Tr. 712-715.)  Dr. Betbadal assessed osteoarthritis, and ordered x-rays.  (Tr. 714.)  Edgington underwent x-rays of her left knee and bilateral hips on that date, which were normal.  (Tr. 1043, 1041.)

On May 8, 2013, Edgington presented to the emergency room ("ER") after falling down a flight of stairs.  (Tr. 649-656.)  She complained of pain in her right arm/shoulder and wrist, which she rated an 8 on a scale of 10.  (Tr. 649, 651.)  Edgington underwent a CT of her cervical spine, which showed (1) mild scoliosis with straightening of the cervical spine; and (2) degenerative disc disease, more prominent at the C5-C6 level with a moderate disco-osteophytic bulging, bilateral mild to moderate neuroforaminal narrowing, and mild central canal stenosis. (Tr. 653, 1029-1030.)  X-rays of her right shoulder and right wrist revealed no acute fracture or dislocation.  (Tr. 1031-1032.)  Edgington was discharged home with pain medication.  (Tr. 653.)

On May 20, 2013, Edgington presented to Dr. McNamara for follow-up.  (Tr. 634-639.) She complained of depression, insomnia, and numbness/tingling in her right arm and shoulder. (Tr. 636-637.)  Dr. McNamara diagnosed cervical radiculopathy, and advised Edgington to resume taking Gabapentin.  (Tr. 637.)

Edgington returned to Dr. McNamara in November 2013 with complaints of thumb pain for the previous six weeks.  (Tr. 584.)  On examination, Dr. McNamara noted swelling and tenderness to palpation of Edgington's left thumb with limited range of motion, mild erythema, and positive Finkelstein's maneuver.  (*Id*.)  She assessed possible osteoarthritis, and ordered x-rays.  (*Id*.)  Edgington subsequently underwent an x-ray of her left hand, which showed minimal degenerative changes at the interphalangeal joints of the thumb with tiny spurs.  (Tr. 1024.)

On December 30, 2013, Edgington continued to complain of severe left thumb pain,

18

particularly when she tried to close her hand.  (Tr. 570-571.)  She also reported "significant pain" in her lower lumbar spine, extending down her left leg.  (Tr. 571.)  Dr. McNamara prescribed a thumb splint, referred Edgington to a hand surgeon, and increased her Gabapentin dosage.  (Tr. 572.)

On January 17, 2014, Edgington presented to Michelle Lee, M.D., for evaluation of her "multiple hand problems."  (Tr. 561-563.)  Specifically, she complained of left thumb pain and locking, and right hand numbness.  (Tr. 561.)  On examination, Dr. Lee noted decreased sensation in Edgington's right hand, full range of motion in her phalangeal joints bilaterally, negative Tinel's and Phalen's in her right hand, and triggering and pain in her left thumb.  (Tr. 563.)  She diagnosed left trigger thumb and right hand sensation loss, administered a thumb injection, and referred Edgington for an EMG.  (Tr. 563, 557-558.)  Edgington underwent the EMG on March 17, 2014.  (Tr. 548-549.)  It revealed evidence of chronic moderate right carpal tunnel syndrome; and mild, subacute right C5 and C6 radiculopathy.  (*Id*.)

On September 5, 2014, Edgington returned to Dr. McNamara with complaints of worsening back pain radiating down her bilateral thighs to her feet along with associated numbness and tingling.  (Tr. 529.)  On examination, Dr. McNamara noted tenderness to palpation in Edgington's thoracic and lumbar spines, positive straight leg testing bilaterally, and decreased sensation.  (Tr 530.)  She referred Edgington for a TENS unit, recommended Lyrica, and ordered thoracic and lumbar x-rays.  (*Id*.)  Edgington underwent the lumbar x-ray several weeks later, which was normal.  (Tr. 1022.)  Her thoracic x-ray showed mild multilevel degenerative changes. (Tr. 1021.)

On October 16, 2014, Edgington reported "some benefit" from Lyrica, but continued to

19

complain of severe back pain.  (Tr. 489.)  On examination, Dr. McNamara noted tenderness to palpation in Edgington's entire spine, reduced strength in her right hip, diminished sensation, and a "mild new foot drop on the left."  (Tr. 489-490.)   She ordered an "urgent MRI" and prescribed Toradol for pain.  (Tr. 490.)

Two days later, Edgington presented to the ER with complaints of persistent, acute, chronic back pain.  (Tr. 471-484.)  She underwent an MRI of her lumbar spine, which showed (1) stable degenerative desiccative signal change of the L4-L5 and L5-S1 discs, unchanged since 2011; (2) stable central disc bulges of the L4-L5 and L5-S1 discs, without compressive discopathy; (3) no new acute interim disc protrusions or herniations; (4) normal lower thoracic and lumbar bony spinal canal, no hypertrophic canal stenosis; and (5) normal lower thoracic spinal cord, conus medullaris, and cauda equina.  (Tr. 472.)  Edgington was discharged home with a short course of Percocet.  (*Id.*)

Edgington returned to Dr. McNamara on October 23, 2014.  (Tr. 462-467.)  She reported her pain was "mildly improved . . . but it is still quite severe and impacting her quality of life." (Tr. 465.)  Dr. McNamara referred Edgington to pain management.  (Tr. 466.)  Edgington presented to pain management physician Dina Hanna, M.D., on December 19, 2014.  (Tr. 391-392.)  On examination, Dr. Hanna noted Edgington had decreased range of motion in her lower spine, positive facet loading test, positive straight leg raise, and bilateral facet tenderness.  (*Id.*) She also noted that Edgington walked with a cane.  (*Id.*)  Dr. Hanna concluded "the majority of her pain is mechanical likely due to lumbar spondylosis as well as discogenic."  (*Id.*)  She recommended weight loss, core muscle strengthening, and lifestyle modifications.  (*Id.*)  Dr. Hanna also recommended medial branch blocks and increased Edgington's Lyrica dosage.  (*Id.*)

20

Edgington underwent bilateral lumbar medial branch blocks on January 26, 2015.  (Tr. 376.)

On June 29, 2015, Edgington returned to Dr. McNamara with complaints of continued numbness, pain, and tingling in her hands.  (Tr. 343.)  She reported the numbness was "so severe that she frequently drops things and has a hard time gripping things."  (*Id*.)  Edgington also complained of severe bilateral lower extremity pain and right foot numbness.  (*Id*.)  She reported Pregbalin, Flexerin, and "at least 25 ibuprofen tablets over the counter daily," with some relief. (*Id*.)  Dr. McNamara ordered a cervical MRI.  (Tr. 344.)

Edgington underwent the MRI on July 14, 2015, which showed : (1) disc degeneration with central and bilateral paracentral disc herniation causing mild central canal compromise at C5-C6 level, (2) a small central disc herniation at C6-C7; (3) mild bilateral neural foramen from osteophytes at C5-C6, and (4) mild left neural foramen compromise at C6-C7.  (Tr. 312.)  Dr. McNamara interpreted these results as showing "significant" degenerative joint disease.  (Tr. 345.)

On August 19, 2015, Edgington presented to pain management physician Dr. Veizi.  (Tr. 320-324.)  On examination, Dr. Veizi noted grossly normal, non-antalgic gait; limited spinal range of motion due to discomfort; normal muscle strength; intact sensation; and negative Spurling's, Hoffman's, and straight leg raise testing.  (Tr. 322.)  With regard to Edgington's back pain, Dr. Veizi found as follows:

> First, the radiating pain does not appear to follow a specific nerve distribution.  I cannot really identify any sensory deficit that would indicate towards a specific nerve root irritability.  My exam is totally benign and strength and sensory exam is symmetrical.  Most of her pain is back pain.  I believe that rather than facetogenic type of pain her symptoms of diffuse back pain could be originating from degenerative disc disease. This [is] more difficult to treat. This is the reason that several procedures such as . . . injections and medial branch blocks did not appear to be offering her much relief. The best treatment for degenerative disc disease is

21

rehabilitation.

(Tr. 323.)  Dr. Veizi suggested Edgington follow up with a chiropractor, and consider "complex rehabilitation program such as our intensive outpatient rehabilitation program, IOP."  (*Id*.) Edgington later reported that she left Dr. Veizi's office "feeling suicidal, depressed, and defeated."  (Tr. 314.)  She felt he had told her "there is no medical reason for me to be in pain" and "it is all in my head."  (*Id*.)

On September 11, 2015, Edgington presented to chiropractor Anthony Battalgia, D.O. (Tr. 309-313.)  She rated her pain an 8 on a scale of 10, and stated she had "a hard time doing her laundry."  (Tr. 309.)  On examination, Dr. Battaglia noted reduced range of motion, positive compression testing, generalized stiffness, normal reflexes, and hypertonic cervical and upper dorsal spinal musculature.  (Tr. 312-313.)  He assessed lumbar and cervical sponydlosis.  (Tr. 313.)

Edgington returned to Dr McNamara on October 19, 2015.  (Tr. 290-295.)  She reported significant pain relief with Cymbalta, but continued to rate her back pain a 6 on a scale of 10. (Tr. 293.)  Dr. McNamara adjusted her medications, recommended stretching exercises, and prescribed a wrist splint. (Tr. 294.)  The following month, Edgington presented to the ER with complaints of lower back pain after picking up a heavy box.  (Tr. 1180-1187.)  She was prescribed a Medrol Dose Pak and discharged home with a diagnosis of acute lower back pain. (Tr. 1180.)

On December 15, 2015, Edgington presented to pain management psychologist Cynthia Vankeuren, Psy.D.  (Tr. 1099-1100.)  She reported she was "very happy with" Cymbalta, and described it as "life changing."  (*Id*.)  Dr. VanKeuren diagnosed panic disorder, pain disorder

22

(somatic symptom disorder under DSM-V), lumbar radiculopathy, and neck pain.  (*Id*.)  She

noted Edgington was unsure whether she could tolerate the stress of participating in an intensive

outpatient program, and "would like to focus on continuing to address this with mental health."

(*Id*.)

On March 1, 2016, Edgington presented to Brittany Kalapach, M.D., for evaluation of her

right carpal tunnel syndrome.  (Tr. 1326-1329.)  She reported her grip strength was decreased,

and denied any pain relief with splints.  (Tr. 1326.)  Examination revealed normal pulses,

decreased grip strength bilaterally, decreased sensation on the right, and positive Tinel's and

Phalen's on the right.  (Tr. 1328-1329.)   Dr. Kalapach recommended carpal tunnel release

surgery.  (Tr. 1329.)

Edgington returned to Dr. McNamara on March 24, 2016.  (Tr. 1302-1309.)  She reported

her pain was "under better control" with Cymbalta.  (Tr. 1307.)  Nonetheless, on September 22,

2016, Edgington underwent back surgery, specifically a right-sided T7-8 transpedicular

diskectomy with microscopic dissection.  (Tr. 1642-1643.)  The record reflects Edgington

underwent aquatic therapy post-surgery, with some improvement.[6]  (Tr. 1555-1558, 1543-1548,

1532-1533, 1629-1632, 1620-1628, 1597-1600.)

On June 5, 2017, Edgington reported to Dr. McNamara that she was "doing somewhat

better" and her back pain was improved with aquatherapy.  (Tr. 1535.)  However, she

complained of severe right neck, shoulder, and left hip pain.  (*Id*.)  Examination revealed full

range of motion of her left hip, full range of motion with pain and tenderness to palpation in her

---

[6] It also appears she participated in several occupational therapy sessions for her hands.
(Tr. 1559-1561, 1550-1552.)

right shoulder, normal muscle strength, normal reflexes, decreased sensation, and positive Spurling's maneuver.  (Tr. 1537-1538.)  Dr. McNamara referred Edgington to physical therapy for her shoulder and hip.  (Tr. 1538.)  She also prescribed a left hip injection, which Edgington underwent on June 17, 2017.  (Tr. 1539, 1600-1602.)

Edgington presented for a physical therapy evaluation on June 22, 2017.  (Tr. 1605-1608.) Physical therapist Bryan Geletka noted decreased flexibility, weakened middle and lower trapezius musculature, weak deep cervical flexors, decreased ease with cervical range of motion, and occasional increased upper trapezius pain.  (Tr. 1607.)  Edgington was scheduled for physical therapy one to two times per week for six to eight weeks.  (Tr. 1608.)

On July 27, 2017, Edgington presented to the ER with complaints of neck and left arm pain after lifting her three year old granddaughter.  (Tr. 1584-1593.)  Examination revealed tenderness to palpation in her paracervical muscles, normal muscle strength, and normal gait. (Tr. 1586.)  Edgington was diagnosed with cervical radiculopathy– acute flare, and prescribed a Medrol Dose Pak.  (Tr. 1586-1587.)

**C.     State Agency Reports**

   **1.     Mental Impairments**

On November 10, 2015, state agency psychologist Kristen Haskins, Psy.D., reviewed Edgington's medical records and completed a Psychiatric Review Technique ("PRT") and Mental Residual Functional Capacity ("RFC") Assessment.  (Tr. 72-73, 77-78.)  In the PRT, Dr. Haskins found Edgington had mild restrictions in her activities of daily living and maintaining social functioning, and moderate restrictions in maintaining concentration, persistence, and pace. (Tr. 73.)

24

In the Mental RFC, Dr. Haskins found Edgington was moderately limited in her abilities to  (1) maintain attention and concentration for extended periods; (2) work in coordination with or in proximity to others without being distracted by them; (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and (4) respond appropriately to changes in the work setting.  (Tr. 77-78.)  In the narrative sections of the assessment, Dr. Haskins noted as follows:

> Claimant would need work area separate from others to enhance focus where claimant would receive intermittent supervision to ensure claimant is working towards desired production and quality goals.  Claimant would need occasional flexibility with changing scheduled shifts and breaks when experiencing increased periods of symptoms.
>
> * * *
>
> Clmt is easily overwhelmed with change as thoughts tend to ruminate.  Claimant would need major changes to a set work routine explained in advance and slowly implemented to allow claimant time to adjust to the new expectations.

(Tr. 78.)

On February 29, 2016, state agency psychologist Kathleen Malloy, Ph.D., reviewed Edgington's medical records and completed a PRT and Mental RFC Assessment.  (Tr. 88, 92-93.)  In the PRT, Dr. Malloy found Edgington had mild restrictions in maintaining social functioning, and moderate restrictions in her activities of daily living and in maintaining concentration, persistence, and pace.  (Tr. 88.)  With regard to the Mental RFC, Dr. Malloy reached the same conclusions as Dr. Haskins.  (Tr. 92-93.)

**2.      Physical Impairments**

On November 10, 2015, state agency physician Robert Wysokinski, M.D., reviewed

25

Edgington's medical records and completed a Physical RFC Assessment. (Tr. 74-77.) Dr. Wysokinski concluded Edgington could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about 6 hours in an 8 hour workday; and sit for about 6 hours in an 8 hour workday. (Tr. 74-75.) He further found Edgington could frequently push/pull, balance, stoop, kneel, and crouch; occasionally crawl and climb ramps/stairs; and never climb ladders, ropes, and scaffolds. (Tr. 75.) With regard to her manipulative limitations, Dr. Wysokinski opined Edgington was limited to frequent gross manipulation on the right, but had an unlimited capacity to reach, finger, and feel. (Tr. 75-76.) Finally, he found Edgington should avoid all exposure to unprotected heights. (Tr. 76.)

On April 4, 2016, state agency physician Leanne Bertani, M.D., reviewed Edgington's medical records and completed a Physical RFC Assessment. (Tr. 89-92.) Dr. Bertani reached the same conclusions as Dr. Wysokinski, with the exception that she found Edgington should avoid concentrated exposure to unprotected heights and "concentrated dusts." (*Id*.)

**D.   Hearing Testimony**

During the August 4, 2017 hearing, Edgington testified to the following:

- She lives with her twenty-six year old son. (Tr. 42.) Her son is autistic and requires constant supervision. (*Id*.) She is in the house with him 98% of the time. (Tr. 43.) Her adult daughter also helps and is at the house every day for at least a couple of hours. (*Id*.)

- She has a four year degree. (Tr. 44.) She last worked in January 2011. (*Id*.) From 2004 to 2010, she worked out of her home as a bookkeeper. (Tr. 44-45.) In this position, she would sit for 30 to 45 minutes before needing to get up and walk around. (Tr. 45-46.) She lifted 10 pounds at most. (*Id*.) Prior to that, she did personal tax returns. (Tr. 46.) In that position, she was seated 60% of the day and was on her feet the remaining 40% of the day. (*Id.*)

- She can no longer work due to her depression. (Tr. 46-47.) She has a tendency to "fall into a hole." (*Id*.) There have been extended periods of time when she

did not leave her house.  (Tr. 48-49.)  Several times per week she will "just lay in bed instead of doing things that need to be done."  (Tr. 51-52.)  Overall, she has 8 "good" mental health days per month.  (Tr. 55.)  On the remaining 22 "bad" days per month, she has difficulty getting out of her room.  (*Id*.)  On those days, her daughter has to come over to tell her what to do.  (Tr. 52.)  Her psychiatrist wants her to do in-patient treatment but she "just can't do it" because she is afraid of leaving her house.  (Tr. 55-56.)

- Due to her depression, she has difficulty focusing and concentrating.  (Tr. 46-47, 59.)  She has difficulty doing chores, such as washing dishes, due to "mental fatigue" and lack of motivation.  (Tr. 58.)  She participates in therapy and takes medication, which is helpful.  (Tr. 48.)  However, her depression is "still not controlled all the time."  (*Id.*)  When she has a depressive episode, her daughter cares for her autistic son.  (Tr. 49.)

- She has daily panic attacks.  (Tr. 59.)  They are often caused by fear of having to leave the house, or feeling overwhelmed by household tasks.  (*Id*.)  Her panic attacks last 20 to 30 minutes.  (Tr. 59-60.)  During her attacks, she experiences heart palpitations, chest tightness, and difficulty breathing.  (Tr. 60.)

- She also suffers from chronic back pain.  (Tr. 47.)  She recently had thoracic back surgery and is currently doing physical therapy for her cervical radiculopathy.  (*Id*.)  Her back surgery was "somewhat successful," in that it prevents some of the pain.  (Tr. 48.)  However, she still experiences daily pain as a result of a pinched nerve.  (*Id*.)  Her back pain is constant and occurs every day.  (Tr. 50.)  On a typical day, her back pain is a 7 on a scale of 10, with medication.  (*Id*.)

- She also experiences symptoms in her hands and arms.  (Tr. 60.)  She had carpal tunnel surgery on her right hand, but it did not eliminate the numbness.  (*Id*.)  She was in the emergency room the previous week because she lost "all ability to do anything with her left arm."  (Tr. 61.)  Overhead reaching is a "big problem" for her.  (Tr. 56.)  She is able to put both hands above her head but it is painful.  (Tr. 57.)  This makes it difficult for her to engage in self-care activities such as washing and brushing her hair.  (Tr. 56.)

- She does not sleep well.  (Tr. 57.)  She takes sleeping medication.  (*Id*.)  She sleeps a total of 6 to 8 hours per night, but wakes often.  (*Id*.)  As a result, she is tired during the day.  (Tr. 58.)  Her brain feels "fuzzy" and she has trouble remembering things.  (*Id*.)  Focusing and concentrating are difficult for her.  (Tr. 59.)

- She is prone to injury because of her conditions.  (Tr. 51.)  She recently threw her back out by putting her hair in a ponytail.  (*Id*.)  She also herniated a disc by

27

coughing. (*Id.*)

- She is able to sit for 30 to 45 minutes before needing to change position, due to tightness in her back and pinching in her shoulders. (Tr. 51.) She is able to stand for 45 minutes. (*Id.*) She can walk the length of a football field in a few minutes. (*Id.*) She can lift no more than 2 gallons of milk. (*Id.*) Her most comfortable position is standing. (Tr. 56.)

- She spends the majority of her day reading on her tablet. (Tr. 52.) She will read a 300 to 400 page book every couple of days. (Tr. 53.) She does have trouble focusing when reading, and has a tendency to "wander off in [her] head." (*Id.*) She often has to go back and reread chapters of her book multiple times. (Tr. 59.)

- She and her son do the laundry together, with him doing the lifting and her doing the "mechanical parts." (Tr. 54.) She cooks when she is having a good day; i.e., a couple times/ week. (*Id.*) When she is not having a good day, her daughter handles dinner. (*Id.*) It takes her longer to do tasks likes washing dishes, due to her back pain and depression. (Tr. 50.) She takes care of her checking accounts, and has no difficulty making change or counting money. (Tr. 53-54.) She has a drivers license and drives two to three times per week for doctor appointments. (Tr. 44.) In addition to spending time with her children, she sees her father once per week, always at her house. (Tr. 52.)

The VE testified Edgington had past work as a bookkeeper (sedentary, skilled, SVP 6).

(Tr. 62.) The ALJ then posed the following hypothetical question:

[A]ssume a hypothetical individual the claimant's age and education with the past position, that you described. Further assume that the hypothetical individual's limited as follows. And then my 1st hypothetical to light, frequent righthand controls, frequent right handling, occasional climbing of ramps and stairs, never climb ladders, ropes, or scaffolds. Frequently balance, stoop, kneel, crouch, and occasional crawl. Environmental limitations never to be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle, frequent exposure to dust or to fumes and pulmonary irritants. Intellectual limitations limited to performing simple, routine, repetitive tasks, but not at a production rate pace, i.e. assembly line work. Limited to simple work-related decisions in using her judgement and dealing with changes in the work setting. First, could that hypothetical individual perform that past position, that you described as actually performed or generally performed in the national economy?

(Tr. 62-63.)

28

The VE testified the hypothetical individual would not be able to perform Edgington's past work as a bookkeeper but would be able to perform other representative jobs in the economy, such as photocopy machine operator (light, unskilled, SVP 2), inspector hand packager (light, unskilled, SVP 2), and mail clerk (light, unskilled, SVP 2).  (Tr. 63.)

The ALJ then asked a second hypothetical that was the same as the first, with the following additional limitations: "[F]requent left and right-hand controls.  Occasional reaching overhead, with the left and right.  Frequent reaching in all other directions with the left and right.  Frequent handling and fingering with the left and the right.  Occasional balance, stoop, kneel, crouch.  Frequent exposure to humidity and wetness, extreme cold, and extreme heat.  Able to frequently interact with supervisors, coworkers, and the public."  (Tr. 63-64.)  The VE testified the hypothetical individual could perform the previously identified jobs of photocopy machine operator, inspector hand packager, and mail clerk.  (Tr. 64.)

The ALJ then asked a third hypothetical that was the same as the second but "modifying the interaction with coworkers and the public to occasional." (Tr. 64.)  The VE against testified the same three jobs would be available.  (*Id*.)

In his fourth hypothetical, the ALJ asked the VE to "modify the exertional limitation in hypotheticals 2 or 3 to sedentary."  (*Id.*)  The VE testified the hypothetical individual could perform representative jobs in the economy such as document addresser (sedentary, unskilled, SVP 2), final assembler (sedentary, unskilled, SVP 2), and inspection positions (sedentary, unskilled, SVP 2).  (Tr. 64-65.)

The ALJ asked whether these three jobs would be available if the interaction with supervisors was modified to occasional (rather than frequent).  (Tr. 65.)  The VE testified the

29

document addresser, final assembler, and inspection position jobs would still be available.  (*Id.*)

Finally, the ALJ asked as follows:

Q:      And my 5th hypothetical, if I were to add that the hypothetical individual, in addition to normal work breaks, would be off task 20% of an eight-hour work shift and/or absent from work two days per month, applying either of those limitations to each of my earlier hypotheticals, do those change your responses?

A:      Yes.  Based on that, there would be no work.

Q:      And why is that Ms. Schabacker?

A:      Now, in regard to absences, in my opinion, no more than one absence per month, on an ongoing basis.  And I would also include arriving late and/or leaving early.  Now, we're talking about unskilled work, so in my opinion, no more 10% off task for an unskilled job, on a regular consistent basis. And that would exclude the standard break periods.

(*Id.*)

Edgington's attorney then asked the VE to consider "what would be work preclusive as far as working in isolation."  (Tr. 65-66.)  The VE testified that "when you work in isolation, especially at the unskilled level, there's no work."  (*Id.*)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended.  42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

30

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Edgington was insured on her alleged disability onset date, January 1, 2011, and remained insured through December 31, 2017, her date last insured ("DLI.") (Tr. 15-16.) Therefore, in order to be entitled to POD and DIB, Edgington must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve

month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.

2.    The claimant has not engaged in substantial gainful activity since January 1, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.    The claimant has the following severe impairments: disc herniation and degenerative changes to the cervical and lumbar spine; status post right T8 transpedicular discectomy; minimal IP joint degenerative changes at the left thumb; right carpal tunnel syndrome; obstructive sleep apnea; COPD; obesity; depression; anxiety; posttraumatic stress disorder; and panic disorder (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526.)

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she can lift/carry 10 pounds occasionally, less than 10 pounds frequently, and she can push/pull as much as she can lift/carry.  The claimant can sit for six hours, stand for two hours, and walk for two hours in an eight-hour workday.  She is limited to frequently operating hand controls bilaterally.  In addition, the claimant is limited to occasionally reaching overhead and frequently reaching in other directions with her  bilateral upper extremities.  She can frequently handle and finger with her hands bilaterally.  In addition, the claimant can climb ramps or stairs
occasionally, never climb ladders, ropes, or scaffolds, and occasionally balance, stoop, kneel, crouch, or crawl.  She can never work at unprotected heights, never work around moving mechanical parts, and never operate a motor vehicle.  She can frequently be exposed to humidity and wetness, dust, odors, fumes, and  pulmonary irritants, extreme cold, and  extreme heat.  The claimant is limited to simple, routine, and repetitive tasks but not at a production rate pace (e.g., assembly line work); she is limited to simple

work-related  decisions in using her  judgment and dealing with changes in the  work  setting;  she  can  frequently  interact  with  supervisors  and  occasionally
interact with coworkers and the public.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on January ** 1969 and was 41 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.  The claimant subsequently changed age category to a younger individual age 45-49 (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 3).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2011, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 15-28.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been

33

defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if

supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### *Listings 12.04, 12.06, 12.15*

In her first assignment of error, Edgington argues the ALJ erred in concluding she did not satisfy the Paragraph A and Paragraph B criteria for Listings 12.04, 12.06, and 12.15.  (Doc. No. 12 at 18-24.)  With regard to the Paragraph B criteria, Edgington argues the ALJ mischaracterized and misconstrued the evidence in finding she had only moderate limitations in the areas of understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting oneself.  (*Id*.)  Specifically, Edgington asserts the ALJ failed to acknowledge evidence in the record regarding her concentration deficits, reliance on her daughter to be her primary caretaker, difficulty leaving the

35

house, hypervigilance, and severe depression.  (*Id*.)  With regard to the Paragraph A criteria, Edgington relies on her psychological treatment records and hearing testimony to show that she meets all of the requirements of Listings 12.04, 12.06, and 12.15.  (*Id*.)

The Commissioner argues the ALJ reasonably determined Edgington did not meet or equal a Listing.  (Doc. No. 14 at 12-15.)  She maintains the ALJ properly concluded Edgington had only moderate limitations in the four functional areas set forth in Paragraph B, noting evidence that Edgington was able to prepare meals, complete household tasks, complete a 300 to 400 page book every few days, interact daily with her daughter and granddaughter, care for her autistic son, manage her finances, and drive two to three times per week.  (*Id*.)  The Commissioner asserts the ALJ considered the countervailing evidence cited by Edgington but reasonably concluded she did not meet or equal the requirements of Listings 12.04, 12.06, and 12.15.  (*Id*.)

At the third step in the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the Listing of Impairments. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 Fed. Appx. 488, 491 (6th Cir. 2010).  The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. §§ 404.1525(a), 416.925(a).  Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the

36

criteria of that listing."  20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3).  It is the claimant's burden to bring forth evidence to establish his impairments meet or are medically equivalent to a listed impairment.  *See e.g. Lett v. Colvin*, 2015 WL 853425 at * 15 (N.D. Ohio Feb. 26, 2015).  A claimant must satisfy all of the criteria to "meet" the listing.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).  A claimant is also disabled if her impairment is the medical equivalent of a listing, 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. §§ 404.1526(a), 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment.  *See Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 414-15 (6th Cir. 2011); *Brauninger v. Comm'r of Soc. Sec.*, 2019 WL 2246791 at * 5 (6th Cir. Feb. 25, 2019).  In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for his decision.  *Id.* at 416-17.

Here, the ALJ determined, at step two, that Edgington suffered from the following severe impairments: (1) disc herniation and degenerative changes to the cervical and lumbar spine, (2) status post right T8 transpedicular discectomy, (3) minimal IP joint degenerative changes at the left thumb, (4) right carpal tunnel syndrome, (5) obstructive sleep apnea, (6) COPD, (7) obesity, (8) depression, (9) anxiety, (10) posttraumatic stress disorder, and (11) panic

37

disorder. (Tr. 17-18.) The ALJ then proceeded at step three to find Edgington did not meet or

equal the requirements of Listings 12.04, 12.06, or 12.15, explaining as follows:

> The severity of the claimant's mental impairments, considered singly and in
> combination, do not meet or medically equal the criteria of listings 12.04, 12.06, and
> 12.15. In making this finding, the undersigned has considered whether the
> "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental
> impairments must result in at least one extreme or two marked limitations in a broad
> area of functioning which are: understanding, remembering, or applying information;
> interacting with others; concentrating, persisting, or maintaining pace; or adapting
> or managing themselves. A marked limitation means functioning in this area
> independently, appropriately, effectively, and on a sustained basis is seriously
> limited. An extreme limitation is the inability to function independently,
> appropriately or effectively, and on a sustained basis.
>
> In understanding, remembering, or applying information, the claimant has a
> moderate limitation. The claimant reported that her memory was "terrible" (5E/7).
> She is able to prepare simple foods as well as complete meals, which involve
> multiple steps (5E/5). Every week she spends time cleaning her home, washing
> dishes, and tending to laundry (5E/5). She does not need reminders to attend her
> appointments (5E/7). She is also able to shop online and she spends a lot of time
> reading books (HT). The claimant's mental status examinations throughout the
> record generally indicate that her memory was "normal" or "intact" (1F/6, 10F/5,
> 2F/44, 574). The evidence does not support greater than moderate limitation in
> understanding, remembering, or applying information.
>
> In interacting with others, the claimant has a moderate limitation. The claimant
> alleged that she has "extreme panic" when she leaves her home and difficulty being
> around people (5E/3). She spends time with her daughter every day and plays with
> her granddaughter (5E/4). She reported that when she goes to the store, she needs
> her daughter to come with her (5E/6). The claimant is respectful with authority
> figures and she has never been laid off due to problems getting along with others
> (5E/9). Her mental status evaluations often describe her as friendly and cooperative
> (10F/4, 70, 8F/51). As such, the undersigned finds only moderate limitation in
> interacting with others.
>
> With regard to concentrating, persisting, or maintaining pace, the claimant has a
> moderate limitation. The claimant reported that her concentration was "terrible"
> (5E/7). She is able to manage her finances such as paying bills, counting change, or
> managing a bank account (5E/7). She testified that she reads a book - 300 to 400
> pages - every few days (HT). She also drives her car regularly, which requires
> attention and concentration on a sustained basis (HT). Based on such evidence, the
> claimant has only moderate limitation in this functional domain.

As for adapting or managing oneself, the claimant has experienced a moderate limitation. According to the claimant, she does not handle stress or changes in routine well (5E/9). Although she lacks motivation, she is able to independently perform self-care such as brushing her teeth, bathing, or taking medication (HT). She can also perform household chores, manage her finances, shop online, prepare meals, and care for her son (HT, 5E).  As such, the undersigned finds the claimant has no greater than moderate limitations in adapting or managing oneself.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

(Tr. 20-21.)

As set forth *supra*, Edgington asserts the ALJ erred in finding she did not meet or equal the requirements of Listings 12.04, 12.06, and 12.15.  (Doc. No. 12.)  These Listings contain the following criteria: (i) "Paragraph A" criteria, impairment-related symptoms, (ii) "Paragraph B" criteria, impairment-related limitations, and (iii) "Paragraph C" criteria, additional functional criteria.  20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.00A(2), 12.04, 12.06, 12.15.  A claimant can meet the requirements of these Listings only if she satisfies either: (1) the criteria of both Paragraphs A and B; or (2) the criteria of Paragraph C.  *See Bowman v. Comm'r of Soc. Sec.*, 683 Fed. Appx. 367, 372 (6th Cir. 2017).  Here, Edgington does not argue she meets or equals the Listing's "Paragraph C" criteria.  The Court will, therefore, focus exclusively on whether Edgington's impairments meet or equal the "Paragraph B" and "Paragraph A" criteria.

In order to satisfy the "Paragraph B" criteria of the Listings 12.04, 12.06, and 12.15,[7] Edgington must exhibit "marked" or "extreme" functional limitations in two or more of the following categories: (1) understanding, remembering, or applying information; (2) interacting

---

[7] Listing 12.04 relates to depressive, bipolar and related disorders; Listing 12.06 relates to anxiety and obsessive-compulsive disorders; and Listing 12.15 relates to trauma- and stressor-related disorders.

with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing onself.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.00A(2)(b); *Bowman,* 683 Fed. Appx. at 372; *Vecchio v. Comm'r of Soc. Sec.*, 2017 WL 2644129 at * 7 (N.D. Ohio April 28, 2017).  To establish a "marked" limitation in any of these areas, the claimant's impairment must "seriously interfere with the ability to function independently, appropriately, and effectively."  *See Foster v. Bowen*, 853 F.2d 483, 491 (6th Cir. 1988); *Harvard v. Comm'r of Soc. Sec*., 2015 WL 506976 at * 14 (N.D. Ohio Feb. 6, 2015).

The Court will discuss Edgington's arguments with respect to the above categories separately, below.

### *Understanding, Remembering and Applying Information*

Edgington first argues the ALJ erred in finding she was moderately restricted in the category of understanding, remembering, and applying information.  (Doc. No. 12 at 19.)  She maintains the ALJ mischaracterized the evidence in finding she could prepare meals, perform household chores, shop online, and read books.  (*Id.*)  In particular, Edgington argues the ALJ failed to recognize evidence that she (1) needs assistance or reminders from her daughter to perform most of her daily activities; (2) has difficulty focusing on the storylines of the books she reads; and (3) has significant daily fatigue due to her sleep problems.  (*Id.*)

The regulations discuss the category of understanding, remembering, and applying information, as follows:

> This area of mental functioning refers to the abilities to learn, recall, and use information to perform work activities. Examples include: Understanding and learning terms, instructions, procedures; following one- or two-step oral instructions to carry out a task; describing work activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities;

and using reason and judgment to make work-related decisions. These examples illustrate the nature of this area of mental functioning. We do not require documentation of all of the examples.

20 CFR Part 404, Subpt. P, Appx 1, § 12.00(E)(1).

The Court finds substantial evidence supports the ALJ's determination Edgington has a less than marked restriction in understanding, remembering, and applying information.  As the ALJ correctly notes, Edgington reported that, although it may take additional time, she is able to perform multi-step tasks such as preparing simple meals, performing household chores, shopping online, managing her checking accounts, and driving to medical appointments.  (Tr. 50, 53-54, 189-190.)  Moreover, Edgington testified that, although she may occasionally lose focus, she can nonetheless read a 300 to 400 page book "every couple of days."  (Tr. 53.)  Finally, mental status examinations routinely found organized thought process, normal speech, and intact memory. (Tr. 239-240, 321, 832, 823-824, 806, 800, 790, 773, 752, 629, 623, 616, 589, 498, 416, 402, 330, 851, 1087, 1563, 1497-1498.)

Edgington highlights hearing testimony indicating she is unable to perform household chores or cleaning without help, needs reminders to complete tasks, and her children do nearly all of the housework on a regular basis.  The ALJ, however, placed greater weight on the normal mental status examination findings in the record, as well as Edgington's 2016 Function Report in which she states she can complete meals and perform some household chores.  (Tr. 189.)  It was not error for the ALJ to do so.  As noted earlier, the substantial evidence standard presupposes "there is a zone of choice within which the [ALJ] may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).  "This 'zone of choice' includes resolving conflicts in the evidence and deciding questions of credibility."  *Postell v. Comm'r of*

*Soc. Sec.*, 2018 WL 1477128 at * 10 (E.D. Mich. March 1, 2018) (citing *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987)).  Here, the ALJ's findings are within that "zone of choice" and thus supported by substantial evidence.  *See e.g., Vecchio*, 2017 WL 2644129 at * 8; *Black v. Comm'r of Soc. Sec.*, 2015 WL 350573 at * 6 (S.D. Ohio Jan 26, 2015).

Accordingly, the Court finds the ALJ did not err in finding Edgington had a less than marked limitation in the category of understanding, remembering, and applying information.

### Interacting with Others

Edgington next argues the ALJ erred in finding she was moderately restricted in the category of interacting with others.  (Doc. No. 12 at 20.)  She maintains the ALJ failed to sufficiently acknowledge evidence that Edgington has difficulty leaving her home, experiences panic attacks, locks her doors and keeps the curtains drawn, and experiences flashbacks and nightmares.  (*Id.*)  Edgington asserts substantial evidence does not support the ALJ's conclusion that she can interact with others on a sustained basis.  (*Id.*)

Regarding interacting with others, the regulations provide as follows:

> This area of mental functioning refers to the abilities to relate to and work with supervisors, co-workers, and the public. Examples include: cooperating with others; asking for help when needed; handling conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness. These examples illustrate the nature of this area of mental functioning. We do not require documentation of all of the examples.

20 CFR Part 404, Subpt. P, Appx 1, § 12.00(E)(2).

Although a somewhat closer call, the Court finds substantial evidence supports the ALJ's determination that Edgington has a moderate restriction in interacting with others.  The

42

ALJ expressly acknowledged Edgington's testimony that she experiences self-isolation, hypervigilance, and panic attacks.  (Tr. 20, 25.)  However, there is also substantial evidence in the record showing Edgington had a strong relationship with her family, particularly her daughter and granddaughter.  (Tr. 43, 188, 191.)  Specifically, Edgington testified her daughter visits every day for several hours and stated she socializes with her daughter daily.  (Tr. 43, 191.)  In addition, Edgington reported she visits with her father and with friends once or twice a week and, further, that she does not have any problem getting along with authority figures.  (Tr. 52, 191, 193.)  She also stated she goes to the store once per month and occasionally goes out with her father.  (Tr. 190-191.)  Finally, as the ALJ correctly noted, mental status examinations routinely noted that Edgington was friendly and cooperative with good eye contact.  (Tr. 239, 832, 823-824, 806, 800, 790, 773, 752, 629, 616, 589, 498, 416, 402, 368, 330, 317, 302, 1160, 1087.)   While there is evidence in the record to support Edgington's argument, the Court finds, based on the above, that the ALJ's finding of moderate limitations in this area is supported by substantial evidence.  *See, e.g., Primmer v. Comm'r of Soc. Sec.,* 2015 WL 9474691 at * 2 (S.D. Ohio Dec. 29, 2015) (finding substantial evidence supported ALJ's determination of moderate limitations in social functioning where, although the claimant had difficulty around others and panic attacks, she was able to go to the store with her sister-in-law, attend doctor appointments on a regular basis, and talk with others on a daily basis, and was cooperative during mental status examinations); *Gonzalez v. Comm'r of Soc. Sec.*, 2014 WL 3735249 at * 12 (E.D. Mich. July 29, 2014) (finding substantial evidence supported ALJ's determination of moderate limitations in social functioning where, although the claimant avoided interpersonal relationships and isolated herself, she was able to interact successfully with people when shopping and using public

43

transportation and treatment records indicated she was consistently cooperative and polite).

### *Concentration, Persistence, and Pace*

Edgington next argues the ALJ erred in finding she was moderately restricted in the category of concentration, persistence, and pace.  (Doc. No. 12 at 21.)  She argues the ALJ failed to acknowledge her testimony that, while she enjoys reading, she often struggles to follow the storylines of her books and "wanders off" in her head.  (*Id*.)  Edgington also emphasizes evidence of her lack of motivation, including evidence that she will not leave her house for days-to-weeks at a time.  (*Id*.)

Regarding concentration, persistence, or pace, the regulations provide as follows:

> This area of mental functioning refers to the abilities to focus attention on work activities and stay on task at a sustained rate. Examples include: Initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day. These examples illustrate the nature of this area of mental functioning. We do not require documentation of all of the examples.

20 CFR Part 404, Subpt. P, Appx 1, § 12.00(E)(3).

The Court finds substantial evidence supports the ALJ's determination that Edgington has a moderate restriction in concentration, persistence, and pace.  The ALJ expressly acknowledged Edgington's testimony that her concentration was "terrible."  (Tr. 20.)  However, the ALJ noted that Edgington acknowledged she could read a 300 to 400 page book every few days, as well as manage her finances and regularly drive a car.  (*Id*.)  These findings are supported by substantial evidence.  Specifically, Edgington testified that, although she sometimes loses focus and has to reread portions of her book, she nonetheless is able to complete a 300 to 400

44

page book "every couple of days."  (Tr. 53, 59.)  She further indicated that, while she sometimes forgets to pay bills, she is able to handle her savings and checking accounts and count change. (Tr. 190-191.)  Edgington also testified she drives two to three times per week for doctor appointments.  (Tr. 44.)  Moreover, state agency psychologists Drs. Haskins and Malloy both found Edgington had moderate restrictions in concentration, persistence, and pace.  (Tr. 73, 88.) The ALJ found these physicians' opinions were consistent with the medical evidence.  (Tr. 25-26.)

Accordingly, and based on the above, the Court finds the ALJ's determination that Edgington has a moderate limitation in concentration, persistence, and pace is supported by substantial evidence in the record.

### *Adapting Oneself*

Finally, Edgington argues the ALJ erred in finding she was moderately restricted in the category of adapting oneself.  (Doc. No. 12 at 21-22.)  She emphasizes evidence indicating she was often neglectful of her hygiene and self-care, and frequently remained in bed for extended periods of time due to her depression.  (*Id.*)  Edgington also notes she endorsed suicidal ideations "many times throughout treatment," and "frequently dialed the suicide and crisis hotlines for assistance."  (*Id.*)

The regulations discuss the category of adapting onself, as follows:

This area of mental functioning refers to the abilities to regulate emotions, control behavior, and maintain well-being in a work setting. Examples include: Responding to demands; adapting to changes; managing your psychologically based symptoms; distinguishing between acceptable and unacceptable work performance; setting realistic goals; making plans for yourself independently of others; maintaining personal hygiene and attire appropriate to a work setting; and being aware of normal hazards and taking appropriate precautions. These examples illustrate the nature of this area of mental functioning. We do not require

documentation of all of the examples.

20 CFR Part 404, Subpt. P, Appx 1, § 12.00(E)(4).

While this category is also a closer call, the Court finds substantial evidence supports the ALJ's determination Edgington has a moderate restrictions in the category of adapting oneself. The ALJ acknowledged Edgington's reports that she lacks motivation, has difficulty dealing with stress, and experiences depression and anxiety symptoms.  (Tr. 20, 25.)  However, the ALJ assessed moderate restrictions in this category in light of Edgington's ability to independently perform self-care activities such as dressing and bathing, perform household chores, manage her finances, shop online, prepare meals, and care for her autistic son.  (Tr. 20.)  These findings are supported by substantial evidence.  In her 2016 Function Report, Edgington stated her impairments did not affect her ability to dress, use the toilet, feed herself, or take baths.  (Tr. 188.) She also indicated she could prepare simple meals for herself, perform some household chores (such as cleaning and dishes), shop online, and handle her savings and checking accounts.  (Tr. 189-191.)  During the August 2017 hearing, Edgington similarly testified she cooks several times per week and, though it takes longer, is able to perform tasks such as washing dishes and helping with the laundry.  (Tr. 53-54.)  She also testified her autistic son requires "constant supervision" and that she cares for him with her daughter's help.  (Tr. 42-43.)  Finally, the record reflects that Dr. Rubai frequently assessed GAF scores indicating only moderate restrictions.  (Tr. 808, 801, 791, 775, 754, 631-632, 405, 333, 318, 1121, 1335, 1565.)

In sum, "[b]ecause the ALJ reached [her] decision using correct legal standards and because those findings were supported by substantial evidence, the Court must affirm it, even if reasonable minds could disagree on whether the individual was disabled or substantial evidence

46

could also support a contrary result." *Postell*, 2018 WL 1477128 at * 10 (citing *Wright v.*

*Massanari*, 321 F.3d 611, 614 (6th Cir. 2003)).  *See also Longworth v. Comm'r of Soc. Sec.*, 402

F.3d 591, 595 (6th Cir. 2005) ("If substantial evidence supports the Commissioner's decision, this

Court will defer to that finding even if there is substantial evidence in the record that would have

supported an opposite conclusion.").  As noted *supra*, the substantial evidence standard

presupposes "there is a zone of choice within which the [ALJ] may proceed without interference

from the courts."  *Felisky*, 35 F.3d at 1035.  For all the reasons set forth above, the Court

concludes the ALJ's findings herein are within that "zone of choice."

Accordingly, it is recommended the Court find the ALJ did not err in finding, at Step

Three, that Edgington's impairments do not meet or equal the requirements of Listings 12.04,

12.06, and/or 12.15.[8]  This assignment of error is without merit.

*RFC*

Edgington next argues the ALJ's RFC determination is improper because it fails to

incorporate limitations relating to off-task behavior and absenteeism.  (Doc. No. 12 at 25-27.)

With regard to her psychological impairments, Edgington argues "her inability to maintain focus

and concentration, difficulties with her sleep habits and rest, and the resulting negative impacts of

a lack of sleep on [her] body and mental well-being" support further limitations relating to off-

task behavior.  (*Id*.)  With regard to her physical impairments, she maintains that she can only sit

for 30 to 45 minutes before needing to change position and, further, requires frequent five minute

breaks in order alleviate her physical pain.  (*Id*.)

---

[8] Because it is recommended the Court find the ALJ did not err in finding Edgington did
not satisfy the Paragraph B criteria, the Court need not address the Paragraph A criteria
of the specific Listings at issue.

The Commissioner argues the RFC is supported by substantial evidence.  (Doc. No. 14 at 15-25.)  She argues the many normal psychological examination findings in the record support the mental limitations in the RFC, as does evidence suggesting Edgington improved with consistent medication and treatment.  (*Id*.)  With regard to Edgington's physical impairments, the Commissioner argue the RFC is supported by the objective medical evidence (including normal examination findings and mild diagnostic imaging results) and the medical opinion evidence. (*Id*.)  The Commissioner also emphasizes that Edgington has not directed the Court's attention to any medical opinion stating she would miss more than one day of work per month on a consistent basis, or that she would be off-task more than ten percent of the workday.[9]  (*Id*.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).[10]  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon

---

[9] The Commissioner also argues the ALJ's credibility evaluation is supported by substantial evidence.  However, as Edgington did not raise this issue as a ground for relief, the Court will not address it herein.

[10] This regulation has been superseded for claims filed on or after March 27, 2017.  As Edgington's applications were filed in September 2015, this Court applies the rules and regulations in effect at that time.

which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774 F.Supp.2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed. Appx. 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96–8p at *7, 1996 WL 374184 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

The Court will address Edgington's arguments regarding the mental and physical limitations set forth in the RFC separately, below.

### *Mental RFC*

At step two, the ALJ found Edgington suffered from the severe mental impairments of depression, anxiety, posttraumatic stress disorder, and panic disorder.  (Tr. 18.)  After finding Edgington's impairments did not meet or equal the requirements of a listing, the ALJ proceeded, at step four, to consider the medical and opinion evidence regarding her mental impairments.  (Tr. 19-27.)  The ALJ expressly acknowledged Edgington's allegations of depression, panic attacks, self-isolation, difficulty concentrating, hypervigilance, hyperarousal, flashbacks, insomnia, and decreased energy.  (Tr. 22, 25.)  The ALJ found Edgington's impairments could reasonably be expected to cause her alleged symptoms; however, he concluded her statements concerning the

49

intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the

medical evidence.  (Tr. 22.)  Specifically, the ALJ determined Edgington's mental impairments

were not as disabling as alleged in light of the many normal mental examination findings in the

record, as well as evidence that she improved with conservative treatment:

> In terms of the claimant's mental impairments, she has a history of overlapping symptoms resulting in diagnoses including depression, anxiety, post-traumatic stress disorder, and panic disorder (2F/9).   She endorsed symptoms of self-isolation, hypervigilance, hyperarousal, flashbacks, insomnia, and decreased energy (1F/10-14, 18, 2F/39, 91,311).  She also reported experiencing panic attacks, daily at times, which she described as sweating, heaviness, palpitations, and shortness of breath (2F/496).  On examination,  she was cooperative, well groomed, with good eye contact and she smiled and laughed (2F/40).  She described her mood as "OK" she had no unusual thought content and her thought process was organized (2F/40). Indeed, throughout the record, her mental status examinations were generally unremarkable (2F/523, 312, 130, 125, 91, 53).  She has a history of outpatient therapy and she has utilized psychotropic medications (2F/554).  Although there is evidence of non-compliance and missing therapy sessions, her symptoms improved with regular treatment (2F/657).  This cycle repeated in the more recent medical evidence.  In early 2016, the claimant reported that she felt very depressed and was having panic attacks, but she had stopped taking her medications and she was not attending her counseling sessions (5F/1, 6F/21).  She later reported that her mood was better when she resumed medication and attended her regular meetings with her mental health team (10F/42).  The objective evidence, as well as the claimant's testimony, demonstrate that her conservative treatment has been effective in controlling her symptoms.

(Tr. 25.)  The ALJ also noted Edgington engaged in a "somewhat normal level of daily activity,"

including preparing meals, driving a car, managing her finances, performing household chores,

shopping online, reading, and caring for her autistic son.  (*Id.*)  Finally, the ALJ found the

opinions of state agency psychologists Drs. Haskins and Malloy that Edgington was capable of

working with certain limitations, to be consistent with the medical evidence.  (Tr. 25-26.)

The ALJ then assessed the following mental limitations in the RFC: "The claimant is

limited to simple, routine, and repetitive tasks but not at a production rate pace (e.g., assembly

line work); she is limited to simple work-related decision in using her judgment and dealing with changes in the work setting; she can frequently interact with supervisors and occasionally interact with coworkers and the public." (Tr. 21.)

The Court finds the mental limitations set forth in the RFC are supported by substantial evidence. As the ALJ correctly notes, aside from a depressed mood, mental status examinations were routinely normal, including consistent findings that Edgington was alert and oriented with fair to good hygiene, cooperative behavior, good eye contact, normal speech, normal psychomotor activity, and organized thought process. (Tr. 239-240, 832, 823-824, 806, 800, 790, 773, 752, 616, 589, 498, 416, 402, 330, 317, 1099, 1087, 1563.) Moreover, while Edgington's mood varied from visit to visit, the record reflects she showed improvement with medication and treatment. In November 2011, she had a smiling mood and "brighter, more reactive" affect. (Tr. 806.) In April 2012, Edgington reported improvement with Wellbutrin, stating her mood was "pretty good." (Tr. 773.) In May 2012, Edgington reported "better mood and energy," and stated her concentration was improved with no recent panic attacks. (Tr. 752.) In November 2013, she endorsed better sleep and decreased suicidal ideation with medication. (Tr. 588.) The following year, Edgington reported further benefits with medication, stating "I feel hopeful, not as depressed." (Tr. 401.) In August 2015, she indicated her medication was helping with her mood. (Tr. 329.) In December 2015 and January 2016, Edgington stated she was "very happy" with Cymbalta, stating it helped with both her physical pain and anxiety/depression and was "life changing." (Tr. 1099, 1086.) In April 2017, Edgington indicated improvement with Buspar and Cymbalta. (Tr. 1562.)

Additionally, and as discussed *supra*, substantial evidence supports the ALJ's finding

that Edgington's daily activities were inconsistent with her allegations of disabling mental health symptoms.  Specifically, in both her 2016 Function Report and during the August 2017 hearing, Edgington indicated she could prepare simple meals for herself, perform some household chores (such as cleaning and dishes), shop online, drive a car several times per week, and handle her savings and checking accounts.  (Tr. 53-54, 189-191.)  She also testified her autistic son requires "constant supervision" and that she cares for him with her daughter's help.  (Tr. 42-43.)

Finally, with regard to the opinion evidence, both Drs. Haskins and Malloy concluded Edgington was capable of working despite her mental health impairments.  (Tr. 77-78, 92-93.) Further, the record reflects Dr. Rubai frequently assessed GAF scores indicating only moderate restrictions.  (Tr. 808, 801, 791, 775, 754, 631-632, 405, 333, 318, 1121, 1335, 1565.)  Notably, Edgington does not direct this Court's attention to any treating physician opinion indicating she would be off task more than 10% of the workday and/or absent for more than one day per month. Nor does she specifically identify the particular additional limitations she believes should have been included in the RFC to account for her alleged off task behavior or absenteeism.

In sum, the Court finds the ALJ acknowledged Edgington's mental health impairments and symptoms, and included numerous limitations in the RFC to account for them.  The ALJ determined additional limitations were not warranted in light of the many normal mental status examination findings in the record, as well as evidence of Edgington's improvement with conservative treatment.  For the reasons set forth above, the Court finds the ALJ's determination is supported by substantial evidence.  Edgington's argument to the contrary is without merit.

### Physical RFC

With regard to Edgington's physical impairments, the ALJ determined, at step two, that

she suffered from the severe impairments of disc herniation and degenerative changes to the

cervical and lumbar spine; status post right T8 transpedicular discectomy; minimal IP joint

degenerative changes at the left thumb; right carpal tunnel syndrome; obstructive sleep apnea;

COPD; and obesity.  (Tr. 17-18.)  After determining her impairments did not meet or equal the

requirements of Listings 1.02, 1.04, 3.02A, or 11.14, the ALJ proceeded, at step four, to consider

the medical and opinion evidence regarding Edgington's physical impairments.  The ALJ first

acknowledged Edgington's complaints of constant back pain, neck pain, thumb pain and locking,

and carpal tunnel syndrome in her right hand.  (Tr. 22-24.)  The ALJ also acknowledged evidence

of abnormal physical examination findings (such as positive straight leg raise, tenderness to

palpation, and limited range of motion), and diagnostic imaging showing disc herniation and disc

bulges.  (Tr. 22-23.)

However, the ALJ noted that physical examinations also contained many normal

findings, including normal motor strength in her lower extremities and non-antalgic gait.  (*Id*.)

He also found Edgington experienced significant pain relief with Cymbalta and some

improvement with aquatherapy.  (*Id*.)  Finally, with regard to the opinion evidence, the ALJ noted

that both Drs. Wysokinski and Bertani concluded Edgington was capable of working despite her

physical impairments.  (Tr. 25-26.)

The ALJ concluded as follows:

> Overall, the claimant's alleged level of physical impairment and pain is unsupported
> by the medical evidence.  Aside from her thoracic surgery, the claimants conditions
> have been managed conservatively with medication, physical therapy and injections
> (11F/27, 2F/105, 218, 10F/10- 26, 52-70).  Her physical examinations and notes from
> physical therapy consistently note pain and tenderness, but they are generally
> unremarkable  with normal strength, sensation, gait, and other postural maneuvers
> (11F/9, 22).  The record also contains evidence of non-compliance with prescribed
> treatment.  She was discharged from physical therapy due to multiple missed

appointments and the records show that she was not using her sleep equipment (11F/22-23, 34).

(Tr. 24-25.)  The ALJ then assessed the following physical limitations in the RFC: "[Edgington] can lift/carry 10 pounds occasionally, less than 10 pounds frequently, and she can push/pull as much as she can lift/carry.  The claimant can sit for six hours, stand for two hours, and walk for two hours in an eight-hour workday.  She is limited to frequently operating hand controls bilaterally.  In addition, the claimant is limited to occasionally reaching overhead and  frequently reaching in other directions with her  bilateral upper extremities.  She can frequently handle and finger with her hands bilaterally.  In addition, the claimant can climb ramps or stairs occasionally, never climb ladders, ropes, or scaffolds, and occasionally  balance, stoop, kneel, crouch, or crawl. She can never work at unprotected heights, never work around moving mechanical parts, and never operate a motor vehicle.  She can frequently be exposed to humidity and wetness, dust, odors, fumes, and  pulmonary irritants, extreme cold, and  extreme heat."  (Tr. 21.)

The Court finds the physical limitations set forth in the RFC are supported by substantial evidence.  At the outset, the Court notes Edgington has failed to identify any specific limitations that she believes should have been included in the RFC.  Nor has she directed this Court's attention to any treating physician opinion in the record that would support the argument that additional physical limitations are warranted.  These omissions, in and of themselves, are fatal to Edgington's argument.

Additionally, Edgington has failed to demonstrate that the ALJ's physical RFC assessment is not supported by substantial evidence.  As the ALJ noted, it is true that treatment records show abnormal physical examination findings, including tenderness to palpation, positive straight leg raise, limited range of motion, and/or decreased sensation.  *See, e.g.*, Tr. 819, 795-

54

796, 756, 584, 563, 530, 489-490, 391-392, 312-313, 1328-1329, 1586.  However, the record also contains a number of normal physical examination findings as well, including (most notably) normal 5/5 muscle strength in Edgington's lower extremities, normal and non-antalgic gait, normal sensation, full range of motion, normal grip strength, normal reflexes, negative facet loading testing, and negative Lachman's, McMurray's, Spurling's and Hoffman's.  (Tr. 819, 795-796, 739, 322, 1537-1538, 1586.)  In addition, substantial evidence supports the ALJ's conclusion that Edgington showed improvement with medication and aquatherapy.  As noted *supra*, in December 2015 and March 2016, Edgington reported she was "very happy" with Cymbalta, stating it had helped with her pain and describing it as "life changing."  (Tr. 1099-1100, 1307.)  Further, post-thoracic surgery, Edgington reported her back pain had improved with aquatherapy.  (Tr. 1535.)

In light of the above, and given Edgington's failure to identify any specific additional limitations that she believes are warranted, the Court finds the ALJ's determination is supported by substantial evidence.  Edgington's argument to the contrary is without merit.

Accordingly, and for all the reasons set forth above, it is recommended the Court finds the ALJ's RFC determination is supported by substantial evidence.

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

*s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: June 6, 2019

55

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).